IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID E. CLARK,

      Petitioner,

      v.

JEFF NOBLE, WARDEN, Madison
Correctional Institution,

      Respondent.

:

:

:

:

Case No. 3:17-cv-151

JUDGE WALTER H. RICE

---

DECISION AND ENTRY ADOPTING IN PART AND REJECTING IN
PART UNITED STATES MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATIONS (DOC. #37); SUSTAINING IN PART AND
OVERRULING IN PART PETITIONER'S OBJECTIONS (DOCS. ##35
AND 39) TO UNITED STATES MAGISTRATE JUDGE'S ORDERS
(DOCS. ##18, 27, 29, 34) AND REPORT AND RECOMMENDATIONS;
OVERRULING RESPONDENT'S MOTION TO DISMISS PETITION AS
TIME-BARRED (DOC. #23) WITHOUT PREJUDICE TO RENEWAL
FOLLOWING AN EVIDENTIARY HEARING; COURT TO APPOINT
COUNSEL AND SET EVIDENTIARY HEARING

---

In 1992, 15-year-old David E. Clark was convicted of aggravated murder,
attempted aggravated murder, aggravated arson and aggravated burglary. He
allegedly set fire to Judy Simpson's house after stealing a microwave oven from
her Dayton, Ohio, home. Judy Simpson was severely injured and her daughter,
Amanda, died as a result of the fire. Clark was sentenced to an indefinite prison
term of 21 to 75 years, to be served consecutively to a term of life in prison.

On April 27, 2017, Clark filed a Petition Under 28 U.S.C. § 2254 for a Writ
of Habeas Corpus, Doc. #1. Respondent has moved to dismiss the Petition as

time-barred. Doc. #23. This matter is currently before the Court on United States Magistrate Judge Michael R. Merz's Report and Recommendations, Doc. #37, recommending that the Court sustain Respondent's motion, and on numerous Objections raised by Petitioner to that Report and Recommendations and to several other Orders previously issued by Magistrate Judge Merz, Docs. ##35, 39.

## I. Background and Procedural History

Clark's conviction became final in 1994. Twenty-three years later, on April 27, 2017, he filed a Petition for a Writ of Habeas Corpus. Doc. #1. Clark asked that counsel be appointed. He also asked for a preliminary injunction in the form of adequate access to legal resources, copies of opening statements and closing arguments from his trial, reports of the arson investigation, funds for a private investigator to obtain recantation affidavits from three of his co-defendants, and for a psychological evaluation of his ability to adequately represent himself in this litigation. Doc. #2.

On initial screening, Magistrate Judge Merz ordered Clark to show cause why the Petition should not be dismissed as time-barred under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d). Doc. #6. He denied Clark's motion for appointment of counsel and for a preliminary injunction, both without prejudice to renewal after the statute of limitations issue was decided. Doc. #7.

Clark filed Objections to the Show Cause Order, Doc. #12. He cited various mental disabilities that have allegedly impacted his ability to engage in litigation and complained about a lack of adequate legal resources. He then set forth the many reasons why he believed that the "actual innocence" exception to AEDPA's one-year statute of limitations excused his untimely filing. In support of this claim, Clark submitted thirteen pieces of "new evidence." *Id.* at PageID##97-102.

The Court recommitted the matter to Magistrate Judge Merz, Doc. #13, who withdrew the Show Cause Order and ordered Respondent to file an answer. Doc. #16. Clark then wrote a letter, again asking that counsel be appointed so that he could amend his petition before Respondent was served. Doc. #17. Magistrate Judge Merz again denied the request for appointment of counsel without prejudice, but informed Clark of his right to file an amended petition before Respondent filed his answer. Doc. #18.

On November 13, 2017, having been granted an extension of time, Respondent filed a Motion to Dismiss, arguing that the Petition must be dismissed as untimely under the AEDPA. Doc. #23. Clark asked for an extension of time to respond. He also requested a full-size copy of the attachments to the Motion to Dismiss, and for a full trial transcript, including opening statements and closing arguments, on CD/DVD. Doc. #26. Magistrate Judge Merz granted an extension of time. He denied Clark's request for a full-size copy of the attachments but ordered Respondent to certify that Clark had been served with a copy of the trial transcript. He noted that it appeared that the opening statements and closing

3

arguments had not been transcribed or made part of the record on appeal. Doc. #27. He subsequently ordered Respondent to furnish Clark with a copy of the transcript, as submitted on appeal, and gave Clark until January 18, 2018, to respond to the Motion to Dismiss. Doc. #29.

Clark then filed another Motion for Injunctive Relief, Doc. #31, complaining that he had not received his legal mail in a timely manner. He asked for additional time to respond, and for an order reinstating him to his position as a legal clerk at the prison and providing additional access to the law library. Magistrate Judge Merz denied these requests. He did, however, order Respondent to produce the inmate mail log. Doc. #32. It was then discovered that, unbeknownst to Respondent's counsel, Clark had been transferred from Trumbull Correctional Institution to Madison Correctional Institution, which had resulted in the delay in mail delivery. Doc. #33. Thereafter, Magistrate Judge Merz issued an Order substituting Jeff Noble, Warden of the Madison Correctional Institution, as Respondent. He noted that Clark had a duty to notify the Court of his change of address. Doc. #34.

Clark then filed Objections, Doc. #35, to four of Magistrate Judge Merz's Orders, Docs. ##18, 27, 29 and 34. He objected to Magistrate Judge Merz's decisions concerning appointment of counsel, access to adequate legal resources, and access to a complete trial transcript, including opening statements and closing arguments. Clark claimed that, without the opening statements and closing arguments, it was impossible to tell if the prosecution had argued that his co-

defendants' convictions were evidence of *his* guilt. Clark maintained that Magistrate Judge Merz did not fully understand the impact of his mental disorders on his ability to litigate.

With respect to the statute-of-limitations issue, Clark argued that his claims were not time-barred because: (1) the State has created an impediment by preventing him from accessing his records; (2) the State has effectively denied him access to the courts by failing to provide him with adequate legal resources and failing to adequately treat his mental disorders; and (3) the actual innocence exception applies. Doc. #35, PageID#1701.

The undersigned recommitted the matter to Magistrate Judge Merz, Doc. #36, who issued a Supplemental Memorandum on Objections, along with a Report and Recommendations on the Motion to Dismiss, Doc. #37. Magistrate Judge Merz construed Clark's Objections, Doc. #35, as a timely response to the Motion to Dismiss. To the extent that Clark purported to object to Document #18, the Decision and Order re: Letter to Court, Magistrate Judge Merz found the Objection to be untimely.

As to Clark's Objections to his previous Orders, Magistrate Judge Merz again denied without prejudice Clark's request for appointment of counsel. He also denied Clark's request for a complete trial transcript, noting that it was not clear how the absence of transcripts of opening statements and closing arguments was material to the statute-of-limitations issue. Citing Clark's litigation in a related

§ 1983 case, Magistrate Judge Merz rejected Clark's claims that mental disabilities prevented him from effectively litigating. As to Clark's request for additional library time, Magistrate Judge Merz found that because the statute-of-limitations issue was fact intensive, not law intensive, additional library time was not needed. Doc. #37, PageID##1717-18.

Turning to the merits of the statute-of-limitations defense, Magistrate Judge Merz acknowledged that the statute of limitations was tolled during the pendency of Clark's petition for post-conviction relief, but it expired on February 20, 1999. He concluded that Clark had presented no factual detail to support his claims that: (1) the State had prevented him from accessing his records; (2) the State had unconstitutionally denied him access to the courts; or (3) the actual-innocence exception applies. As to the actual-innocence exception, he stated that "Clark does not tell the Court what his purported new evidence is." *Id.* at PageID##1720-21. Magistrate Judge Merz recommended that the Court dismiss the Petition with prejudice as barred by the statute of limitations, deny a certificate of appealability and deny leave to appeal *in forma pauperis*. *Id.* at PageID#1721.

Clark then filed additional Objections to the Report and Recommendations, Doc. #39. He raised several procedural Objections. He argued that his "Letter to Court—Re Withdrawal Order," Doc. #17, was improperly treated as a Motion for Reconsideration instead of as an Objection to Magistrate Judge Merz's rulings on the requests for appointment of counsel and the provision of a complete trial transcript. Clark also objected to the fact that Magistrate Judge Merz construed

his Objections, Doc. #35, as a response to the Motion to Dismiss, given his request for additional time to fully respond to the arguments raised in that motion. He argued that Magistrate Judge Merz failed to fully consider the impact of his mental disabilities on his ability to effectively proceed without counsel and, in addition, gave short shrift to many of his substantive arguments. Clark further argued that, because Respondent had not yet filed an Answer, it was premature for the Court to render a decision on the Motion to Dismiss.

In addition, Clark objected to Magistrate Judge Merz's conclusions on the merits of the statute-of-limitations defense. He argued that, because Magistrate Judge Merz had construed his Objections as his response to the Motion to Dismiss, the arguments raised in his previous filings should have been considered. He claimed that Magistrate Judge Merz failed to conduct any analysis with respect to his arguments of a state-created impediment and the difficulties posed by his mental disorders. Clark again asked for an attorney.

## II.  Standard of Review

The Court must review *de novo* those portions of the magistrate judge's disposition to which proper Objections have been filed. It may then accept, reject or modify the recommended disposition, take further evidence or return the matter to the magistrate judge with instructions. Fed. R. Civ. P. 72(b)(3).

## III. Objections

### A. Procedural Objections

Clark has objected to Magistrate Judge Merz's Orders denying his requests for additional time to respond to the Motion to Dismiss, his requests for appointment of counsel and his requests for other injunctive relief, including copies of transcripts of opening statements and closing arguments and increased access to the law library.

Based on the reasoning and citations of authority set forth by Magistrate Judge Merz in his Orders, Docs. ##18, 27, 29, 34 and 37, as well as upon a thorough *de novo* review of this Court's file and the applicable law, the Court OVERRULES Clark's Objections, Doc. ##35 and 39, on these procedural issues. As Magistrate Judge Merz noted, counsel may be appointed and other resources may be available if an evidentiary hearing is ordered or if the Court determines that the Petition is not time-barred. The Court agrees with Magistrate Judge Merz that Clark has not shown how transcripts of opening statements and closing arguments are relevant to the statute-of-limitations issue. Nor has Clark shown that his ADHD and other mental health issues are so severe that they prevent him from proving that his Petition was timely filed.

Contrary to Clark's belief, there is no need for Respondent to file an Answer prior to filing a Motion to Dismiss. In fact, the Federal Rules of Civil Procedure require a defendant to raise certain defenses in such a motion prior to filing a responsive pleading such as an Answer. *See* Fed. R. Civ. P. 12(b).

8

Clark also argues that Magistrate Judge Merz "jumped the gun," issuing a Report and Recommendations on the Motion to Dismiss before Clark filed his response. He notes that Magistrate Judge Merz repeatedly denied his requests for additional time to respond. The Motion to Dismiss, however, was filed on November 13, 2017. Magistrate Judge Merz extended the deadline for Clark's response to January 18, 2018. Given that Clark filed no response prior to that deadline, he cannot complain about the Report and Recommendations being premature. Nor can he complain about his Objections, Doc. #35, being treated as a timely response to the Motion to Dismiss.

The Court also rejects Clark's claim that his letter, Doc. #17, should have been treated as an Objection to Magistrate Judge Merz's previous Order, instead of as a motion for reconsideration. The letter was not labeled as an Objection and Clark specifically invited the Court to view it as a motion for reconsideration. Doc. #17, PageID#210.

## B. Merits of Statute of Limitations Defense

The Court turns now to Clark's Objections, Doc. #39, to Magistrate Judge Merz's Report and Recommendations, Doc. #37, recommending that the Court sustain Respondent's Motion to Dismiss, Doc. #23, on statute-of-limitations grounds.

## 1.  AEDPA's One-Year Statute of Limitations

AEDPA provides as follows:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Clark's conviction became final in 1994, but the one-year statute of limitations was statutorily tolled, pursuant to 28 U.S.C. § 2244(d)(2), during the pendency of his petition for post-conviction relief.  Therefore, as calculated by Magistrate Judge Merz, the statute of limitations expired on February 20, 1999. Clark's petition was not filed until April 27, 2017.

Relying on 28 U.S.C. § 2244(d)(1)(B), Clark suggests that the statute of limitations has *not yet begun to run* because of two state-created impediments: (1) failure to provide a complete trial transcript; and (2) denial of access to courts as the result of limited access to a law library, failure to provide court-appointed counsel, and lack of access to necessary documents.

Having fully considered Clark's arguments with respect to § 2244(d)(1)(B), the Court OVERRULES his Objections for the reasons previously set forth by Magistrate Judge Merz. Clark has not adequately shown that any of these alleged impediments prevented him from filing his Petition in a timely manner. Accordingly, pursuant to 28 U.S.C. § 2244(d), Clark's Petition must be deemed untimely.

### 2. Actual-Innocence Exception to Statute of Limitations

This, however, is not necessarily the end of the inquiry. Clark has also argued that the "actual-innocence" exception to AEDPA's statute of limitations applies.

#### a. Relevant Law

Clark characterizes the actual innocence exception as part of the equitable tolling doctrine. The Sixth Circuit has recently explained, however, that there is a difference. "[E]quitable tolling requires a showing of diligence, while the actual-innocence exception does not. In actual-innocence-exception cases, courts consider diligence only when determining the credibility of evidence proffered to

show actual innocence." *Davis v. Bradshaw*, 900 F.3d 315, 325 n.6 (6th Cir. 2018) (internal citations omitted).

The Sixth Circuit's explanation of the actual-innocence exception in *Davis* is worth quoting at length:

> A habeas petitioner is entitled to an equitable exception to AEDPA's one-year statute of limitations if he makes a credible showing of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 392, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013); *Souter v. Jones*, 395 F.3d 577, 599 (6th Cir. 2005). This type of actual-innocence claim, sometimes called gateway innocence, "does not by itself provide a basis for relief." *Schlup v. Delo*, 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The innocence showing is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)). Thus, a petitioner's showing of a credible claim of innocence allows him to skirt a procedural defect in his claim so that a federal court may address his allegation of constitutional error.
>
> But this innocence gateway is a narrow one. The Supreme Court has cautioned that it "should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 569 U.S. at 401, 133 S.Ct. 1924 (citation and internal quotation marks omitted). The exception "applies to a severely confined category: cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Id.* at 395, 133 S.Ct. 1924 (alteration in original) (citation and internal quotation marks omitted); *see Souter*, 395 F.3d at 590. The reviewing court must make a "probabilistic determination about what reasonable, properly instructed jurors would do." *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (citation omitted).
>
> Because a gateway-innocence claim "involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly

supplemented record." *Id.* In doing so, we "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* (citations and internal quotation marks omitted). We also "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of [new] evidence." *Id.* at 537, 126 S.Ct. 2064 (citations and internal quotation marks omitted).

*Davis*, 900 F.3d at 326.

As the Supreme Court noted in *House*, "[t]he court's function is not to make an independent determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." 547 U.S. at 538.

To satisfy his burden at this stage of the proceedings, a petitioner is not required to prove his innocence with absolute certainty. *Id.* The Sixth Circuit, in *Davis*, explained what types of evidence might be sufficient to satisfy the actual-innocence exception:

For a petitioner to establish entitlement to the actual-innocence exception, he must support his allegations of constitutional error with new, reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial. *Id.* For example, in the one Supreme Court case in which the petitioner satisfied the gateway-innocence standard, the Court held that "the central forensic proof connecting [the petitioner] to the crime—the blood and the semen—ha[d] been called into question and [he] ha[d] put forward substantial evidence pointing to a different suspect." *Id.* at 554, 126 S.Ct. 2064. Although it was "not a case of conclusive exoneration," and some evidence still "support[ed] an inference of guilt," the Court held that it was "more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.* Similarly, in *Souter*, this court held that the petitioner established gateway innocence where he presented compelling scientific evidence that the "only evidence which directly tie[d]" him to the victim's death, could not have caused the victim's injuries. *Souter*, 395 F.3d at 590.

13

In contrast, we have refused to open the innocence gateway when the petitioner's proffered evidence was less reliable. For example, in *Whalen v. Randle*, we held that the petitioner was "unable to demonstrate that he was actually innocent" even though his evidence included testimony by his alleged codefendant that the petitioner was not an accomplice in the robberies because of "the doubtful credibility of petitioner's accomplice." 37 F. App'x 113, 116, 121 (6th Cir. 2002). Similarly, in *Knickerbocker v. Wolfenbarger*, where the petitioner presented an inmate's affidavit stating that the petitioner's codefendant had told the affiant that the petitioner did not strangle the murder victim, we held that this was insufficient to demonstrate the petitioner's actual innocence, in part, because the statements were hearsay, and "thus presumptively less reliable than direct testimony." 212 F. App'x 426, 433 (6th Cir. 2007).

*Davis*, 900 F.3d at 326–27.

### b. Evidence Presented at Trial

Analysis of an actual-innocence claim necessarily starts with a thorough review of the evidence that was presented at trial, the evidence on which the Petitioner's conviction rests.

*Prosecution*:

At David Clark's trial, key witnesses included several teenagers who were allegedly with Clark on the evening in question and had pled guilty or were convicted of charges of involuntary manslaughter and aggravated burglary. Witnesses for the prosecution also included eyewitness Linda Allen, and numerous law enforcement officers and firemen.

Linda Allen testified that late in the evening of April 27, 1991, she was standing on the sidewalk visiting her neighbors. Around midnight, she saw a man emerge from a nearby alley, carrying a microwave oven. Two other men then ran

to catch up with him. These two men, who looked "mean" and "intimidating," appeared to be in their twenties. Tr. at 60-62, 68.[1] About five minutes later, Allen left. As she was walking, she saw smoke coming from a house on Clover Street. Judy Simpson and her daughter, Amanda, lived there. Allen ran and knocked on the door and the front window. When no one answered, she went to the neighbor's house to call 911. She then noticed several boys, including Scott Anspach, running toward the house, yelling "fire." One of the boys, later identified as David Clark, kicked in the front door of the house. John Spicer, Jr., known as "Scooter," lived right across the street from Allen and she was familiar with him. However, he was not with the group of boys that she saw running toward the house that night. Tr. at 62-66, 68-69, 74.

Cynthia Huffman, Jestin Thomason and Robert Brigeman, three other teenagers who were allegedly with David Clark on the evening in question, were also called as witnesses for the prosecution.

Cynthia Huffman testified that, on the evening of April 27, 1991, she, David Clark, Elizabeth Burns, Jestin Thomason, Scott Anspach and Christopher Anspach were all at Robert Brigeman's house talking and playing video games. Tr. at 216-17. David Clark said that he knew a house that had a microwave. He suggested that they break into that house, and then burn the house down to cover their fingerprints. When Robert asked if anyone was home there, David said yes, but that it was "no big deal." Tr. at 219-220. David told Cynthia and the others that

---

[1] Citations are to the trial transcript, Doc. #25.

15

they would act as "look outs." David then got a gas can from the basement of Robert's house and they all then walked to the house he had in mind. Tr. at 221-223. To get there, they had to walk several blocks, jump two fences and cross a highway. Tr. at 245-48. As they neared the house, David and Robert stopped to talk to Scooter Spicer. Cynthia saw no one else with Scooter. Tr. at 222-24, 249.

When they got to the house where Judy and Amanda Simpson lived, Cynthia stayed in front. David and Robert went to the back, came out with the microwave, and then left for a while. When they returned, she saw Robert, Jestin, David and Scooter in the back yard. Robert and Jestin came around the side of the house and the group started walking back toward Robert's house. When they got to the corner, they noticed smoke and then fire coming from the Simpson's house. Cynthia admitted that she had no idea how the fire had started. She and Elizabeth Burns ran back toward the house, started banging on the doors, and flagged down a car to call the fire department. Tr. at 225-28, 255-56.

After the police arrived, Cynthia stayed and gave them a statement. Tr. at 260-62. She testified that Scott and Chris Anspach told her to lie and tell the police that she had seen an individual named Jerry Fuston with a microwave oven. She did so. She testified that she lied because she was afraid that she would get in trouble. Tr. at 229-30. Cynthia conceded that many other lies followed. In a written statement dated May 1, 1991, she said that *Robert Brigeman* told her that *he* had broken into a house and taken a microwave. David then suggested that

16

they all go to that house, so they did.  At some point, Cynthia also gave a videotaped statement in which she said that *Robert* had carried the gas can up from the basement.  On cross-examination, she admitted that these statements were false.  Tr. at 239, 242-43.

She testified that one her written statements was given at the police station.  The police told her that if she told the truth, she could go back home.  Tr. at 264-66.  Cynthia testified, however, that the police were trying to get her to include, in the written statement, things that did not really happen.  For example, they told her that "a certain person said this and this."  Tr. at 267-68.  She admitted that when she, Elizabeth, Jestin and Robert met with the prosecutors prior to trial, there were "big differences" in their stories.  Tr. at 269.

At trial, Cynthia, who had pled guilty to involuntary manslaughter and aggravated burglary, expressed concern that she would never be able to go home.  She testified that, although the police officers and attorneys had promised that she could, "[i]t was all just a bunch of lies to get me to tell the truth they say. . . You just want to get us to tell you something."  She claimed that she got herself in trouble for something she didn't do and lied because she was scared.  Tr. at 271-72.

Jestin Thomason, age 13, who is Cynthia's cousin, likewise testified that he and the others were at Robert Brigeman's house on the night in question.  Tr. at 275.  Jestin met David Clark for the first time that evening.  Tr. at 277.  David and Robert started talking about breaking into a house to steal stuff to sell.  David said

he would then burn the house down. Tr. at 278-79. He went to the basement and returned with a gas can. They all then left the house, jumped the fences, crossed the highway and headed toward Simpson's house. Tr. at 279-81. When they got to Clover Street, they saw Scooter with Willie Boles, Gary Lee, and Tony Wells. David went to talk to them. Tr. at 282-83. They then went to Simpson's house, and hung out in a nearby alley. Tr. at 285.

Jestin testified that he saw David, Scooter, Willie and Gary coming out of the Simpson's house with a microwave. Willie and Gary then took the microwave and left. David and Scooter went back into the house and came back out. David then got the gas can that he earlier had placed under the "duck house" in the Simpson's back yard. Tr. at 287-91. Robert and Jestin went into the kitchen with David and Scooter. Jestin watched as David poured gasoline. When Scooter asked about the people inside the house, David said, "fuck 'em. Let 'em burn." David lit the fire and they all ran out. Tr. at 291-294.

According to Jestin, Cynthia and Elizabeth stayed behind, but he, Robert, Scott, Chris and David ran back to Robert's house. Tr. at 295, 338. After several minutes, they decided to return to the Simpson's house to help. Jestin and Scott broke the windows. Tr. at 295-296. David kicked in the front door. Tr. at 339-40. The firemen and policemen then arrived. Jestin did not run away. Tr. at 341. He gave a statement but did not tell them the truth about what had happened because he did not want to get in trouble. Tr. at 297, 352. According to Jestin,

they then all went back to Robert's house, where David Clark was already asleep on the couch. Tr. at 298.

On cross-examination, Jestin admitted that he had signed a written statement on May 2, 1991, and another sworn statement on June 12, 1991. He had also testified under oath at the probable cause hearing, and at Chris Anspach's July 22, 1991, trial. Tr. at 303-304. Jestin admitted that, at Chris's trial, he falsely testified that they met Tommy and David Fuston on the way to the Simpson's house. Tr. at 325-26. Jestin further admitted that he did not disclose the participation of Willie Boles, Tony Wells and Gary Lee until the eve of Clark's trial. He explained that, because they were not currently in custody, he saw no sense getting them in trouble. Tr. at 299-302, 305, 315. After Scooter told of their involvement, however, Jestin corroborated Scooter's statement. Tr. at 341-42.

At trial, Jestin admitted that "a lot of things I said ain't true." Tr. at 329. He claims that he lied repeatedly under oath because he was stressed and didn't really care. Tr. at 322, 363. He admitted that, in a previous sworn statement, he stated that David had talked about breaking into a house but said nothing about setting the house on fire. Tr. at 312. David did not have a particular house in mind but planned to steal a microwave and VCR. Tr. at 315-17. Jestin, however, later testified at the probable cause hearing and at Chris Anspach's trial that David did not say what he wanted to take from the house. Tr. at 320. At trial, Jestin admitted that his previous sworn statements, indicating that David broke a window

19

to get into the house and then took the microwave to Tommy Fuston's house, were false. Tr. at 328-29, 332-33. Like Cynthia, Jestin admitted that when they met with the prosecutors in preparation for trial, there were differences of opinion concerning the true facts of the case. Tr. at 345.

The prosecution then called Robert Brigeman, age 16, as a witness. Robert had pled guilty to charges of involuntary manslaughter and aggravated burglary. Tr. at 376-77. He testified that he was told that if he did not plead guilty, he would "be s[i]tting at where [David] is today" and he got scared. Tr. at 398. Shortly after Robert took the stand, he surprised the prosecutor by saying "[y]ou about to lock up that man that didn't do shit to nobody." Tr. at 369. After he admitted that he had previously made statements implicating Clark in the arson, the court declared Robert to be a hostile witness. Tr. at 370, 373.

Robert testified that, at the scene, he gave a truthful written statement. Tr. at 392. He and his friends were walking down the street when they saw smoke and then fire. They ran to the house, kicked the door in and heard someone asking for help. They tried to get the neighbors to call 911. Just before this happened, Cynthia and Liz saw two guys running down the alley with a microwave. Tr. at 375.

Robert testified that subsequent statements about David's alleged plot to steal the microwave and then set the house on fire were all lies. Tr. at 388-89. Robert told the prosecutor, "[y]ou are the one who told me to tell the truth and it's

been running on my mind for eight fucking months and I am telling the truth now. If you don't like it, well, you know, the truth hurts." Tr. at 384.

According to Robert, when he was being questioned by the police prior to making written statements on May 1 and May 8, 1991, the police fed him information given by the other kids. The details furnished by the officers formed the basis of the written statements. Tr. at 394-95. Robert's May 1, 1991, statement says that, on the night of the fire, David, Scooter and Jay came to his house carrying a stolen microwave and gold-plated pen set. On the 8th, however, he stated that there was "going to be" a break in. Tr. at 393-94. The teens were later out walking, came across the fire at the Simpson's house and tried to help. Tr. at 397.

Robert's May 8, 1991, statement says that, on the night of April 27, 1991, while he and his friends were playing Nintendo at his house, David said he was going to break into a house and then burn it. David got a gas can from downstairs. They started walking, crossed the highway, and met Scooter. David knew which house they would break into but wouldn't tell them. When they arrived at Simpson's house, Robert, David and Scooter went inside; the others were lookouts. David took the microwave and left with Scooter and Chris. They were gone about half an hour. When they returned, David got the gas can, went into the house with Robert and Scooter and poured gas on the kitchen floor. Robert saw David flicking a lighter and went outside. David and Scooter followed. When Robert asked David about the people inside, David replied, "Fuck them."

David took the gas can back to Robert's house. Tr. at 378-80. At trial, Robert testified that this entire written statement was a lie. Tr. at 380-81. Likewise, Robert testified that his previous statements that David had placed the gas can under the duck house in the Simpson's back yard, had used Robert's lighter to ignite the fire, and had left the gas can at an auto body shop were all false. Tr. at 383-86.

Shortly before the trial started, Officer Lawson asked Robert if Tony Wells was present on the night of the fire. Lawson indicated that Spicer had recently made a statement implicating Tony and two other men. Robert admitted to Lawson that Tony Wells had been there. He testified that he had not disclosed Wells' involvement any sooner because they had been threatened. Tr. at 387, 395-96.

The prosecution then called John Spicer, Jr., "Scooter," to the stand. He had been certified to stand trial as an adult and had agreed to testify against David in exchange for an aggravated murder charge being reduced to involuntarily manslaughter. He pled guilty to involuntary manslaughter and aggravated burglary. Tr. at 400, 446.

Scooter testified that, on the evening of April 27, 1991, he left his house and met Willie, Tony and Gary. They then met up with David, Cynthia, Chris, Jestin, Robert, Chris and Scott. Tr. at 401-03. David, who was carrying a gas can, told Scooter that he wanted to break into a house. They then went to the back of Judy Simpson's house. Tr. at 404-05. He, David and Robert kicked the

door and went inside. David grabbed the microwave, and they left. David gave the microwave to Willie, who took it down the alley. Tr. at 405-07. David, Robert and Scooter then went back in to see what else they could steal. However, Judy Simpson, who was asleep on the living room couch, started to wake up so they left. Tr. at 408-09.

David then grabbed the gas can that he had placed under the duck pen in the back yard. Scooter and Robert followed him back into the house. Scooter saw David pouring gas and asked him about the people in the house. David replied "fuck 'em." Scooter saw a flash and then he, Robert and David ran. Scooter ran back to his own house but returned to the Simpsons when he heard the fire trucks. Tr. at 409-11.

Scooter did not talk to the police that night. The following day, however, Doug Brown, one of his friends, picked him up in his car and took him to the police, where he gave a written statement. Scooter admits that only parts of that statement were true. Tr. at 413-14. Scooter testified that Doug Brown told him what to say to the police. Tr. at 442. He wrote that he saw David Clark at the fire, and that David was bragging that he had stolen a VCR from the Simpson's house. Tr. at 420. This written statement said nothing about a gas can or about David pouring gas. Tr. at 434. Nor did it say anything about Willie Boles, Tony Wells or Gary Lee. Tr. at 421.

Scooter was arrested on May 1, 1991, and taken to the police station where he was questioned. He testified that the police officers gave him details about

what the other kids had said. Tr. at 445. Scooter admitted that he subsequently made many false statements to police and fire officials and to his attorneys. He did so because he did not want to get in trouble. Tr. at 414-16, 423-28, 435, 453-55. He conceded that he did not know what was said at Robert Brigeman's house earlier in the evening because he was not there. Tr. at 418. It was not until the trial began that Scooter disclosed the involvement of Boles, Wells and Lee. Tr. at 428-31.

Several police and fire officials also testified at the trial. Charles William Ford, the fire protection engineer, *i.e.*, fire marshal, for the Dayton Fire Department testified that he was called to the scene of the fire on the night in question. He interviewed Cynthia Huffman, Robert Brigeman, and Scott and Chris Anspach. In their written statements, they each said that they saw smoke, ran to the house and tried to help. None mentioned that David Clark started the fire. Tr. at 517-18, 535-36. On April 29, 1991, Ford took a written statement from John Spicer, Jr., who was brought to him by an individual named Doug Brown. Ford does not know what Brown might have discussed with Spicer in the car on the way there. Tr. at 528-29.

On April 30, 1991, Ford and investigator R.S. Bennett interviewed David Clark at the juvenile detention facility. Clark signed a written statement saying that on the night of the fire he was with Robert, Cynthia and other kids. They crossed the highway and saw smoke and then saw the Simpson's house on fire.

Some of the kids went to call the fire department. David kicked in the front door to try to get the occupants out. Tr. at 514.

After completing his investigation, Ford concluded that the fire started at or near the floor surface in the Simpson's kitchen, that it was incendiary in nature and was intentionally set. Tr. at 503, 505. A can of charcoal lighter fluid was found at the scene, sitting on top of a stool in a storage area next to the kitchen. Tr. at 522-23. Ford could not determine, however, what accelerant was used to start the fire. Tr. at 530.

Dayton police officer Wade Lawson then testified. He spoke with Cynthia, Robert, Elizabeth, Scott, Chris and Jestin at the scene of the fire. Cynthia and Elizabeth told him that they had seen Jerry Fuston carrying a microwave in the alley near the Simpson's house. Tr. at 556-557. Lawson testified that Chris Anspach gave a written statement on May 1, 1991, but immediately after signing it, Chris told him that the written statement was not true. He and his brother were down the street when the fire started and he did not know what had happened. Tr. at 560-62.

*Defense:*

Defense counsel presented three witnesses. Betty Brigeman, Robert's mother, testified that she did not see David carrying anything when the group of teens left her house on the evening of the fire. Tr. at 596-97.

Chris Anspach, age 14, testified next. He was the only teen to plead not guilty to the charges brought against him. Only Jestin Thomason testified against him at his trial. Chris was convicted of the charges. Tr. at 609-10. At Clark's trial, Chris stated that he was at Brigeman's house that night but heard no discussions about breaking into a house or stealing a microwave or VCR. He did not know David Clark before that night. Tr. at 600-01. Chris said that they left Brigeman's and crossed the highway. He did not see John Spicer on the way to the Simpson's house. Tr. at 604. When they were about a block and a half from the Simpson's house, they saw smoke and then fire. They heard a boom in the back of the house. Jestin and Robert busted the front window and David kicked the front door open. Judy Simpson was behind the door, asking for help. The police and firemen then arrived. Tr. at 602-04.

Chris gave a written statement at the scene which was consistent with his trial testimony. Tr. at 604-05. On May 1, 1991, he signed another written statement reciting a different set of facts, but immediately told the police officers that it was false. He testified that he gave this statement because he was scared. Tr. at 607-08.

Chris's brother, Scott Anspach, age 17, also testified. He said that, while at Brigeman's house on the night of the fire, there was no discussion of breaking into a house or of stealing anything. When they left Brigeman's, David was not carrying anything. After they crossed the highway, they saw smoke. Eventually, they saw flames shooting out of the back of Simpson's house. They ran up and

tried to help, busting out the front windows and kicking open the front door. Scott knows John Spicer but did not see him before they arrived at the Simpson's house. Tr. at 613-15.

Like Chris, Scott gave a written statement at the scene which was consistent with his trial testimony. Tr. at 615-16. A couple of days later, he and Chris were picked up and taken to the police station for further questioning. Scott testified that, when he repeated his story to the officers, they accused him of lying. They said that "David said that he did it and everybody is putting the blame on you. If you tell us that David did it, we will let you go home for right now and we will question you later and nothing will happen." Tr. at 617. Scott testified that he subsequently wrote two false statements, lying about David taking a gas can, lighting the fire, and about the rest of them acting as lookouts. He pled guilty because his lawyer told him that he could never get a fair trial, and he was scared. Tr. at 617-18, 629, 633-35.

At the close of David Clark's trial, the jury found him guilty of aggravated burglary, aggravated arson, aggravated murder and attempted aggravated murder.

### c.   New evidence

In his Report and Recommendations, Magistrate Judge Merz concluded that, with respect to his claim of actual innocence, Clark had failed to "tell the Court what his purported new evidence is." Doc. #37, PageID#1721. To the extent that Magistrate Judge Merz construed Plaintiff's Objections, Doc. #35, as his

27

response to the Motion to Dismiss, and looked only to that filing for an accounting of the new evidence, this is a correct statement. Magistrate Judge Merz, however, failed to consider the new evidence cited in Clark's earlier response to the Show Cause Order, Doc. #12.

In that document, in support of his claim of actual innocence, Clark submitted an affidavit of Elizabeth Burns, along with several letters and other statements from the teens that testified against him at trial. He also submitted new evidence with respect to the arson investigation. It is only fair that, in ruling on the Motion to Dismiss, the Court consider the new evidence cited in Plaintiff's response to the Show Cause Order.

### (i)    Recantations of Co-Defendants

The Court turns first to the alleged recantations of Elizabeth Burns, Cynthia Huffman, John Spicer, Jr., and Jestin Thomason.

#### Elizabeth Burns

Elizabeth Burns, age 12, was present at Brigeman's house on April 27, 1991, was a witness to what transpired at the Simpson's house later that night and pled guilty to the same charges as the others. However, she was not called to testify at Clark's trial. It appears that, although the statement she made on the night of the fire was consistent with the statements given by her friends, she later made other statements implicating Clark in the burglary and the arson.

On April 13, 1992, immediately following Clark's conviction, Burns signed an Affidavit stating that none of the teens present that evening broke into the

house or started the fire. Rather, they discovered the house on fire and tried to help. She further stated that "any previous statements made by her contrary to the facts listed in this Affidavit were made under duress and under the false impression that such statements, if made by me, would be in my best legal interest." Doc. #21, PageID#405.[2]

### Robert Brigeman

Clark also submitted an April 10, 1991, Affidavit from Robert Brigeman, which is nearly identical to Elizabeth Burns'. Doc. #21, PageID#404.

### Cynthia Huffman

Clark maintains that, immediately following his trial, Cynthia Huffman sent a letter to his trial attorney, David Williamson. Although Clark no longer has a copy of that letter, he claims that it basically said that she agreed to testify against him only so that she could be released from jail. The Court issued an Order directing Respondent to produce a copy of Cynthia's letter if it was in Respondent's possession. Doc. #41. Counsel for Respondent has indicated that no such letter is in the files, and the prosecutor who tried the case does not recall hearing of such a letter. Doc. #42.

Even if that letter is not currently part of the record, its probable existence is corroborated by an email message sent by private investigator Martin Yant to CBS

---

[2] Burns's Affidavit was the basis for Clark's Motion for a New Trial. He claims that the only reason that she did not testify is that the prosecutors knew that she had recanted her later statements. He further claims that prosecutors failed to disclose this to defense counsel, resulting in a *Brady* violation.

News's Chris Dunst on October 21, 2002. Doc. #12-13, PageID#160. Yant had

been hired by someone who visits Clark in prison. However, the limited funds had

been exhausted and Yant could not afford to continue to work on the case *pro

bono*. Yant suggested that CBS's *48 Hours Investigates* may want to pick up

where he left off and review the facts surrounding Clark's conviction.

According to Yant's email message, six of the teens convicted on charges

stemming from the fire had "now been released from juvenile facilities. All of them

say they were forced to falsely testify that the outsider of the group, David Clark,

set fire to the house after they stole a microwave from the kitchen." *Id.* Yant

went on to say that:

> Two of those who testified against Clark felt so strongly that
> what they did was wrong that they approached Clark's attorney and
> told him how they were forced to lie shortly after they were released.
> The witnesses did this even though Clark was not a friend of theirs.
> They say they had never met him before they hooked up to play video
> games that fateful night.

> Equally important, I think that the people who actually
> committed the robbery and set the house on fire can be identified.
> (These potential suspects were young adults at the time, and the only
> eyewitness stuck, at trial, to her original statement that the people
> she saw coming out of the house were *adults*, not children.)

*Id.*

Yant further noted that Clark's "trial attorney, David Williamson, strongly

believes in David's innocence." *Id.* at PageID#161.[3]

---

[3] This statement is corroborated by an April 24, 2008, letter from Williamson to
the Ohio Innocence Project, in which Williamson states, "[f]or what it is worth, I
have always been convinced of David's innocence." Doc. #12-9, PageID#147.

In a letter to the Court, filed October 22, 2018, Doc. #43, Clark notes that in 2002, when Yant wrote the email message, John Spicer was still in prison. Accordingly, Yant's statement, concerning the two co-defendants who testified against Clark and then told Clark's attorney that they were forced to lie, must be referring to Huffman and Thomason.

### *John Spicer, Jr.*

Clark has also provided three pieces of new evidence purporting to show that John Spicer, Jr., testified falsely against him. Spicer was deposed in *Michigan Millers Mutual Insurance Company v. Charles Anspach,* Case No. 93-2774, a wrongful death action filed in the Montgomery County Court of Common Pleas, arising out of the same incident. In that deposition, taken sometime before September of 1994, Spicer testified that, on the evening of the fire, he was home from 6:00 p.m. until approximately 12:30 a.m., when he heard fire trucks and stepped onto his front porch. Linda Allen was walking down the alley and said that there was a fire. He followed her. As he was running toward the fire, he saw David and the other teens running behind him. Doc. #12-11, PageID##152-53.

Clark also submitted an Affidavit from Spicer, dated May 17, 2001. It states that:

1. He/she did not either help or have knowledge of David Clark burglarizing or setting fire the house.
2. Affiant states further that he only testified that David Clark committed the crimes because he believed it would [remaining text is cut off]

31

Doc. #12-12, PageID#158. Spicer's Affidavit continues on the next page as follows: "3. Aff[ia]nt states further that he openly admits that his testimony against the defendant at trial was nothing but lies made in his own best interest." *Id.* at PageID#159.

Finally, Clark submitted a letter from Spicer, postmarked March 16, 2011, and allegedly received on March 22, 2011. It reads as follows:

> Sorry I did[n't] write sooner but shit happened. Anyways yeah I told you years ago that we lied. Really I though[t] you did it but that's another stor[y]. I tried calling them people in Cin[.] [T]hey never put their number in my phone. So tell them to get a hold of me. Anyways I told you I got you. I'll write more later when I get time.

Doc. #12-14, PageID##162-63.

*Jestin Thomason*

Clark has also submitted new evidence supporting a finding that Jestin Thomason testified falsely against him at trial. In an undated letter, which Clark claims was sent shortly after his trial, Jestin wrote to Clark's attorney, David Williamson, as follows:

> I am writing concerning our last visit. At our last visit you tried to get me to tell the truth about the [crimes] I am committed for. I lied to you again. I admit this. It isn't that I'm trying to lie to you because I'm trying to cover for myself, it is just that if I would have told the truth right there in front of my social worker it would have seemed like I was not dealing with my problems, or facing my crime. I was afraid that it would have went against me. But, I have come to realize that if I do not tell the truth I am going to hurt a lot of people including my family and my friends who are here with me. That is why I am giving you my word that if I can have another chance to do so I will tell the truth. I do not know, maybe it is to[o] late but, I am willing to tell the truth. But, please understand the circumstances I was under last time is what held me from telling the truth.

Doc. #12-10, PageID#148.

More than ten years later, Jestin Thomason sent Clark a letter dated March 30, 2005. It read in pertinent part as follows:

> Look, I want to be completely honest with you. I know you don't think much of me and I don't blame you. Believe me, living with the fact that you're still in there and it's partly because of me, is slowly eating me alive. But the truth is we're all connected by the same thing that screwed all of our lives up! We are all victims of a system of corruption looking for a convenient and easy conviction. They manipulated us and played us against each other . . . but the past is the past. I hope you can forgive me?
>
> The important thing is, we all pull together and help one another and finish this thing . . . because it's not over . . . there can be no closure until you're out and our names are clear. Not to mention the motherfuckas that did that shit. See what the inside of a jail cell looks like!

Doc. #12-18, PageID##176-77. Jestin gave David his contact information, and the names and addresses of Scott, Chris, and Elizabeth. He asked that they stay in touch because "there's so many questions I have about what really happened and who really done it." He speculated that John Spicer knew the truth and had orchestrated things to try to cover something up. Jestin noted that Spicer's April 29, 1991, written statement contained the first allegation that any of them was involved in breaking into the Simpson's house and stealing the microwave, and the first allegation that David had started the fire. Jestin wrote that Spicer "started the story, and the detectives ran with it and simply played us against each other." *Id.* at PageID##177-78.

Finally, Clark submitted an Affidavit from Ali Tatum, dated May 22, 2017. Tatum stated that, in 1995-96, he and Jestin Thomason were both residents at a juvenile detention facility called Riverview. During that time, Jestin told him that he was there because of a house fire that resulted in a death, that he had been pressured to testify falsely against a co-defendant who was now serving life in an adult prison, and that neither of them had anything to do with the crime. Tatum further stated that David Clark had recently been moved into his housing unit at Trumbull Correctional Institution. When they started talking about why they were imprisoned, Tatum realized that Clark was the co-defendant that Jestin had referred to more than twenty years ago. Tatum was not threatened or rewarded in any way for his Affidavit. Doc. #12-16, PageID##173-74.

(ii)     **Arson Investigation**

In further support of his claim of "actual innocence," Clark points to new evidence related to the alleged arson. Clark notes that, at Christopher Anspach's July 22, 1991, trial in juvenile court, the parties stipulated that fire investigator Charles Ford held an opinion, to a reasonable degree of certainty, that the fire was "caused by the ignition of a flammable liquid, which was *on the kitchen table* and the floor area by the kitchen table." Doc. #12-5, PageID#127 (emphasis added). Likewise, when defense expert R. Nusbaum interviewed Ford on February 24, 1992, Ford said that he had determined that the point of origin was "on top of the kitchen table" and that there were no distinctive pour patterns. Doc. #12-6, PageID#144.

Clark claims that this expert witness opinion would have been inconsistent with Spicer's statement that he had observed Clark pouring gas *on the floor*. Clark accuses Ford of changing his testimony to conform to Spicer's testimony. At trial, Ford cited to distinct burn patterns on the floor and made no mention of the fire starting on the kitchen table. Clark maintains that, through reading a peer report of expert testimony in an arson case in Texas, *see* Docs. ##12-7 and 12-8, PageID##145-46, he has recently discovered that in arson cases, multiple investigators sometimes produce reports based on different theories, and the prosecution then picks whichever report best fits the facts of the case.

Clark has also submitted a May 22, 2013, Affidavit of forensic fire scientist Dr. Craig Beyler, who prepared an analysis of the fire investigations in the Texas case cited by Clark. Doc. #12-15, PageID##164-65. Dr. Beyler reviewed Charles Ford's testimony concerning the fire at the Simpson's house. He noted that, in 1991, "the practice of fire investigation was dominated by myths accumulated over decades," myths that have been debunked by modern research. There was no standard-of-care document in 1991. *Id.* Under modern standards, the burn patterns described by Ford would not necessarily lead to the conclusion that the fire started at the floor level or that an accelerant was involved. *Id.* Beyler noted that, although Ford had taken samples of the kitchen floor for chemical evidence of accelerants, no such evidence was found. Ford's opinion was based solely on the "now discredited low burn, irregular pattern indicator." Beyler concluded that,

under modern standards, Ford would be able to opine only that: (1) the fire started in the kitchen; and (2) the cause of the fire was undetermined. *Id.*

### d.    Analysis

At issue is whether the "new evidence" submitted by Clark is sufficient to establish a credible claim of actual innocence such that the constitutional claims raised in his Petition for Writ of Habeas Corpus may be considered on their merits despite the fact that they are time-barred. As previously noted, the evidence of innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non[-]harmless constitutional error." *McQuiggen*, 569 U.S. at 401. The new evidence must show that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. *Id.* at 395. The court must look at all of the evidence, incriminating and exculpatory, old and new, regardless of whether it would be admissible at trial. *House v. Bell*, 547 U.S. 518, 537-38 (2006).

As Clark notes, there is no physical evidence tying him to the theft of the microwave or to the arson. His guilt or innocence rests almost entirely on the shoulders of six children, ages 12-16, who were with Clark at Robert Brigeman's house on the night in question and were present at the scene of the fire. Although they each pled guilty to—or, in Chris Anspach's case, were convicted of— involuntary manslaughter and aggravated burglary, the vast majority of them have denied committing those crimes. They claim to have pled guilty only because they were afraid and thought it would be in their best interests.

Notably, on the night of the fire, none of them ran from the scene when the police and firemen showed up. They voluntarily gave statements saying that they were out walking when they saw smoke, then flames and ran to try to help. Cynthia Huffman admits that she falsely told the police that she saw Jerry Fuston carrying a microwave down an alley. That evening, none of the teenagers implicated Clark in the theft of the microwave or the fire.

The following day, however, John Spicer, Jr., at the direction of Doug Brown, gave a written statement implicating Clark in the theft of a VCR from the Simpson's home and stating that he had seen Clark at the fire. Over the next couple of days, as the other teenagers were further questioned by police and then taken into custody, each made written statements implicating Clark in the crimes. Several of them testified that the police fed them information to include in these written statements. Some of the teens adhered to these written statements. Others recanted, some sooner, some later.

At Clark's trial, three of the teens testified in his favor. Chris Anspach, Scott Anspach and Robert Brigeman each recanted their earlier written statements implicating Clark in the burglary and the arson. They each testified that Clark had nothing to do with the burglary or the fire. They were all out walking, saw the fire and ran to help. The Court agrees with Respondent that Robert Brigeman's April 10, 1991, Affidavit, Doc. #21, PageID#404, which simply corroborates this trial testimony, cannot be considered "new evidence" to support Clark's claim of actual innocence.

Twelve-year-old Elizabeth Burns was not called to testify at Clark's trial. Clark maintains that the prosecution did not call her because it knew that she had recanted her written statement implicating Clark in the crimes. Clark maintains that, because the prosecution failed to disclose this fact, defense counsel did not call her either. Burns's April 13, 1992, Affidavit, which recants her earlier written statement as having been made under duress, must be considered new evidence because it was not presented at trial.

Respondent does not challenge the reliability of Burns' Affidavit, but argues that the Affidavit, which is nearly identical to Brigeman's, should not be considered because it "was cumulative evidence to the testimony heard by the jury." Doc. #23, PageID#942 n.9. Although Burns' Affidavit might be cumulative to Brigeman's trial testimony, it is new, reliable evidence that must be considered in assessing Clark's actual innocence. *See Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (noting that the Sixth Circuit has suggested that, in addition to "newly discovered" evidence, "newly presented" evidence constitutes "new evidence" for purposes of the actual-innocence exception). Given that three other teens had already recanted their written statements and testified in Clark's favor, Burns' additional input might have been enough to tip the scales in his favor.

Of the children who were present at Brigeman's house that night, only Jestin Thomason and Cynthia Huffman, who are cousins, adhered to their later written statements implicating Clark in the crimes. As an alleged eyewitness to the purported burglary and the setting of the fire, Thomason supplied much of the

detail that resulted in Clark's conviction. He admitted at trial that he had previously repeatedly lied under oath about what happened the night of the fire.

Clark has submitted three pieces of "new evidence" supporting a finding that Thomason falsely testified against him at trial. One is the undated letter, purportedly sent to Clark's trial attorney, David Williamson, shortly after the trial, stating that he had not told Williamson the truth, but that he would be willing to do so if given another chance. Doc. #12-10, PageID#148.

The second is Thomason's March 30, 2005, letter to Clark, asking for forgiveness. Thomason stated that "living with the fact that you're still in there and it's partly because of me, is slowly eating me alive. But the truth is we're all connected by the same thing that screwed all of our lives up!" Thomason speculated that John Spicer "started the story, and the detectives ran with it and simply played us against each other." He claimed that "[w]e are all victims of a system of corruption looking for a convenient and easy conviction." Doc. #12-18, PageID##176-79.

The third is Ali Tatum's Affidavit. Tatum states that, while incarcerated with Thomason sometime in 1995 or 1996, Thomason told him that he was there because of a house fire that resulted in a death, that he had been pressured to testify falsely against a co-defendant who was now serving life in an adult prison, and that neither of them had anything to do with the crime. Doc. #12-16, PageID##173-74.

Respondent notes that Thomason has not recanted his trial testimony under oath. Moreover, even if he had, the probative value of such a statement would be questionable. *See McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (noting that affidavits by witnesses recanting their trial testimony are viewed with extreme suspicion). Despite his admission at trial that he had repeatedly lied under oath, the jury appears to have found him credible.

Nevertheless, in this case, there are several reasons to support a finding that Thomason's recantation is trustworthy. First, it is corroborated by other evidence presented at trial. Three of the other children present that night testified that Clark had nothing to do with the burglary or the fire. Their testimony is also consistent with the statement that Thomason gave to law enforcement officers on the night of the fire. Moreover, as previously discussed, there is no physical evidence tying Clark to the crimes.

Second, and more importantly, for many years, Thomason has consistently expressed remorse for falsely implicating Clark in the crimes. Shortly after the trial, he confessed to David Williamson that he had lied. He asked for another chance to tell the truth. Just a few years later, he told fellow detainee Ali Tatum that he had testified falsely against Clark, who was serving a life sentence. Ten years later, when Thomason wrote the letter to Clark, he offered to help exonerate him.

Thomason had nothing to gain by recanting his trial testimony. He had fully served the sentence imposed after he pled guilty to involuntary manslaughter and

aggravated burglary. It appears that his only possible motivation was to assuage his own guilt with respect to Clark's conviction. The fact that he voluntarily contacted Clark thirteen years after the trial lends significant credibility to the statements in his March 30, 2005, letter. *See Cleveland v. Bradshaw*, 693 F.3d at 640 (noting that recantation is more credible where witness has no motive to recant).

Clark has not presented an affidavit from Cynthia Huffman recanting her trial testimony. Nevertheless, in a statement made under penalty of perjury, *see* Doc. #12, PageID#102, Clark wrote that, after his trial, but before he was transferred to the ODRC Reception Center, his trial attorney, David Williamson, forwarded him a letter from Cynthia indicating that she had testified against him only because the authorities led her to believe that she would be released sooner if she did so.

Although the letter itself is not part of the record, the probability of its existence is corroborated by private investigator Martin Yant's October 21, 2002, email message to CBS news, indicating that each of the teenagers convicted on charges stemming from the incident in question has said that they were forced to testify falsely, implicating Clark in the crimes. Doc. #12-13, PageID#160.

The likelihood that Cynthia wrote such a letter is further corroborated by her own trial testimony. As previously noted, she testified that the police suggested what she should put in her May 1, 1991, written statement, including things that did not really happen. She also accused the police and the prosecutors of making

41

certain promises in exchange for her agreeing to testify against Clark. At trial, she admitted that she had no idea how the fire started. She also admitted that she had made numerous false statements to the police.

The Court acknowledges that, absent a sworn recantation by Cynthia, or a copy of the letter itself, the reliability of this "new evidence" stands on shaky ground. Nevertheless, because there is evidence corroborating Clark's claim that Cynthia admitted that she included false information in her written statement on May 1, 1991, and testified under duress, the Court finds it appropriate to consider the probable existence of this letter in adjudicating Clark's actual innocence claim.

John Spicer was the only other teenager who testified against Clark at the trial. As previously noted, Spicer agreed to testify against David in exchange for an aggravated murder charge being reduced to involuntarily manslaughter. Spicer admitted that he was not present at Brigeman's house when Clark allegedly plotted to steal the microwave and burn the house down. He testified that he met Clark and the others on the way to the Simpson's house. He then helped Clark steal the microwave and watched him pour gasoline in the kitchen.

At trial, Spicer testified that Doug Brown told him what to put in his written statement to the police the day after the fire. He wrote that he saw David Clark at the fire, and that David was bragging that he had stolen a VCR from the Simpson's house. Tr. at 420. After Spicer's May 1, 1991, arrest, he gave additional written statements, implicating Clark in also setting the fire. At trial, he admitted that many of these statements were false.

Clark has presented new evidence supporting a finding that Spicer falsely implicated him in the crimes. At the wrongful death trial arising out of the same incident, Spicer testified under oath that on the evening of the fire, he was home until approximately 12:30 a.m. when he heard fire trucks. As he was running toward the fire, he saw David Clark and the other teens running behind him. Doc. #12-11, PageID##152-53. Respondent notes that this evidence does not necessarily exculpate Clark, who could have been returning to the house after setting the fire. It does, however, negate the possibility that Spicer saw Clark steal the microwave from the kitchen, or saw him set the fire.

The copy of Spicer's May 17, 2001, Affidavit, Doc. #12-12, PageID##158-59, allegedly recanting his trial testimony, which was originally submitted by Clark, is problematic in several respects: (1) the second paragraph cuts off mid-sentence; (2) the second page is in a different font; (3) the date appears to have been altered; (4) although allegedly signed by a notary, there is no notarial seal; and (5) it was not signed until almost ten years after Clark's trial.

Clark attached a different copy of Spicer's Affidavit to his October 22, 2018, letter to the Court. The new copy cures most of these problems. The second paragraph now contains a complete sentence: "Affiant states further that he only testified that David Clark committed the crimes because he believed it would improve his own chances of being released sooner." In addition, the second page of the Affidavit now appears to be in the same size font as the first page. It also contains a notarial seal. Doc. #43-2, PageID##1751-52.

Nevertheless, the original typed date still appears to have been crossed out and there is still a question concerning the timeliness of the alleged recantation. Although these remaining flaws still cut against the reliability of Spicer's Affidavit,[4] the Affidavit is consistent with Spicer's trial testimony in the wrongful death case, and with the letter that he sent to Clark in March of 2011, admitting that "we lied," and offering to help exonerate him. Doc. #12-14, PageID##162-63.[5] As with Thomason, the fact that Spicer had nothing to gain at this point by recanting his trial testimony renders his statements more credible. And, as with Thomason, the recantations are consistent with the statements of the majority of the other teens who were present on the night in question.

Some of the new arson evidence that Clark has submitted is of marginal value. As Respondent notes, Clark denied setting the fire at all. He claimed that the house was already engulfed in flames when he arrived at the scene. True, there were slight inconsistencies in Ford's testimony between Anspach's trial and Clark's trial concerning the fire's exact point of origin. Clark accuses Ford of changing his testimony to match that of Spicer and Thomason. However, Spicer

---

[4] Respondent also argues that, even if reliable, Spicer's Affidavit was not presented to the state courts and is, therefore, inadmissible under *Cullen v. Pinholster*, 563 U.S. 170 (2011). However, *Pinholster's* limitation on new evidence does not apply to claims of actual innocence. *Vinson v. Mackie*, No. 14-cv-14542, 2016 WL 6595021, at *1 (E.D. Mich. Nov. 8, 2016); *Lopez v. Miller*, 906 F. Supp. 2d 42, 53-54 (E.D.N.Y. 2012).

[5] It appears that, in 2008, attorneys with the Ohio Innocence Project attempted to obtain an updated Affidavit from Spicer. *See* Doc. #12-17, PageID#175. It is not clear whether they were successful in their efforts.

and Thomason each testified only that Clark poured gas in the kitchen; neither specified whether he poured it on the floor or on the table. Under these circumstances, whether the fire started on the kitchen table or on the floor underneath the kitchen table is largely irrelevant to Clark's claim of actual innocence.

Dr. Beyler opines that, under modern fire investigation practice, Dr. Ford could not have properly concluded, based only on the burn patterns, that the fire was incendiary in nature. He could have concluded only that the fire started in the kitchen and that its cause was undetermined. Certainly, Dr. Beyler's Affidavit does not completely rule out the possibility of arson. It does, however, cast some doubt on Ford's conclusions that the fire was deliberately set and that an accelerant was used. This, in turn, casts additional doubt on the trial testimony of Thomason and Spicer.

In the Court's view, Clark has presented a colorable claim of actual innocence. Because there is no physical evidence linking Clark to the crimes, his guilt hinges almost entirely on the trial testimony of several children who admitted that, because they were scared, coerced and possibly threatened, they lied repeatedly about what happened the night of the fire. Of the seven teens who were with Clark on the night in question, Chris and Scott Anspach, Robert Brigeman and Elizabeth Burns have each, under oath, clearly recanted any inculpatory statements.

That leaves only the trial testimony of Cynthia Huffman, Jestin Thomason and John Spicer, Jr., the three crucial witnesses. The jury apparently found their testimony persuasive enough to support a conviction, despite the fact that they each admitted to making numerous false statements about what actually happened that night and despite the fact that Spicer and Huffman both testified that the content of their written statements, on which their trial testimony was based, was influenced by information fed to them by the police.

Although Huffman and Thomason have not recanted their trial testimony under oath, the Court finds, for the reasons discussed above, that Clark has presented compelling evidence to support a finding that they falsely testified against him. Likewise, although Spicer's Affidavit is still problematic in some respects, it is corroborated by other compelling evidence that Spicer falsely implicated him in the crimes. Dr. Beyler's Affidavit also casts doubt on the arson conviction.

Taken as a whole, the new evidence raises significant questions about Clark's guilt, and undermines confidence in the result of his trial.[6] The Court finds that Clark must be given the opportunity, at an evidentiary hearing, to further flesh

---

[6]  Clark's delay in presenting this new evidence to the Court must be considered in determining the reliability of the new evidence. *House v. Bell*, 547 U.S. at 537. The record shows that, over the years, Clark has diligently, but unsuccessfully, attempted to present much of this new evidence to the state court, in a 1992 motion for a new trial, a 1996 post-conviction petition, a 1999 delayed motion for a new trial, and a 2014 motion for leave to file a motion for a new trial. Under the unique circumstances of this case, the Court finds no reason to believe that Clark's delay in presenting this new evidence in support of his claim of gateway actual innocence has a negative effect on the reliability of that evidence.

out this new evidence supporting his claim of actual innocence. Because he cannot adequately do so without the assistance of counsel, the Court will appoint an attorney to represent him at that hearing. The hearing date will be set after counsel has been appointed.

Accordingly, with respect to the merits of Clark's claim of actual innocence, the Court REJECTS Magistrate Judge Merz's Report and Recommendations, Doc. #37, and SUSTAINS Petitioner's Objections thereto, Doc. #39. The Court OVERRULES Respondent's Motion to Dismiss the Petition for a Writ of Habeas Corpus as untimely, Doc. #23, WITHOUT PREJUDICE to renewal following the evidentiary hearing.

## IV.    Conclusion

For the reasons stated above, the Court ADOPTS IN PART and REJECTS IN PART the United States Magistrate Judge's Report and Recommendations (Doc. #37), and SUSTAINS IN PART and OVERRULES IN PART Petitioner's Objections (Docs. ##35 and 39) to the Report and Recommendations and to the Magistrate Judge's other Orders (Docs. ##18, 27, 29, 34).

The Court OVERRULES Respondent's Motion to Dismiss Petition as Time-Barred, Doc. #23, WITHOUT PREJUDICE to renewal following the conclusion of the evidentiary hearing.

Date: March 25, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE